IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| M.C. by her next friends | ) | |
| THOMAS CHIBNALL | ) | |
| and REBECCA CHIBNALL, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. |
| v. | ) | |
| | ) | |
| SPECIAL SCHOOL DISTRICT | ) | |
| OF ST. LOUIS COUNTY and | ) | |
| WEBSTER GROVES | ) | |
| SCHOOL DISTRICT | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiffs M.C, (Student), by her parents, Rebecca Chibnall (Mother) and Thomas Chibnall (Father) (collectively Parents) and Parents pray for reversal of a special education decision of the Missouri Administrative Hearing Commission pursuant to the Individuals with Disabilities in Education Act, 20 U.S.C. § 1415(i)(2)(A), and for relief for disability discrimination pursuant to Section 504, Rehabilitation Act, 29 U.S.C. § 794 *et seq*. and the Americans with Disabilities Act (ADA), 42 U.S.C. 12131 *et seq*.

## PARTIES

1.      Plaintiff M.C. is a nine-year-old female enrolled in the fourth grade in the Webster Groves School District. She has medical diagnoses of Attention Deficit Hyperactivity Disorder (ADHD), anxiety and Specific Learning Disabilities (SLD) in Basic Reading, Reading Fluency and Math Fluency. Plaintiff M.C. is a resident of St. Louis County, Missouri.

1

2.      Plaintiffs Rebecca and Thomas Chibnall are Student's parents, are residents of St. Louis County and active participants in Student's education and rearing. Both parents are residents of St. Louis County, Missouri.

3.      Defendant Webster Groves School District (WGSD) provides Student general education and teaches a general curriculum, including skills such as reading, writing, and math. Defendant WGSD's principal place of business is in St. Louis County, State of Missouri, and subject to Federal and state law and regulations, including by the U.S. Department of Education.

4.       Defendant Special School District of St. Louis County (SSD) declined to provide Student special education services. Defendant SSD's principal place of business is in St. Louis County, State of Missouri, and subject to Federal and state law and regulations, including by the U.S. Department of Education.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction pursuant to 20 U.S.C. § 1415(i)(2)(A) of the Individuals with Disabilities Education Act (IDEA), 29 U.S.C. § 794(a), 42 U.S.C. §§ 12131-12165, and 28 U.S.C. § 1331. It has supplemental jurisdiction over related state claims pursuant to 28 U.S. Code § 1367(a).

6.      Venue is proper in this district pursuant to 28 U.S.C. § 1391 in that all parties reside or conduct business in this district and all events described in this Complaint occurred within the Eastern District of Missouri. Declaratory relief is authorized by 28 U.S.C. §§ 2201, 2202.

7.      On September 19, 2024, Plaintiffs filed a due process petition before the Missouri Administrative Hearing Commission, exhausting administrative remedies.

## STATEMENT OF FACTS

### Kindergarten, 2020-2021

8.  Student's kindergarten year began under the cloak of COVID-19. It was not an ideal start for schooling, nor should it be a crutch upon which the Districts lean to avoid responsibility and obligations.

9.  Student's parents and extended family have supported her throughout her enrollment at WGSD, including her maternal grandmother, a veteran special education teacher with a Master's degree in reading.

10. Parents expressed concern in kindergarten with Student's speech and language and expressed concern to the school that at times they would say something to Student and Student would hear something entirely different.

11.  Even before Student started school, maternal grandmother had concerns about her expressive and receptive language. During the Due Process Hearing in 2024, maternal grandmother testified that Student had no letter sound knowledge in kindergarten and did not start picking that up until first grade, which was behind expectations.

12.  In January of 2021, her kindergarten teacher wrote to parents with concerns about Student's emotional regulation in school, noting that Student became upset when trying to write, complaining that she "keeps forgetting words that she wants to write".

13. In addition to language concerns, Parents also inquired about speech articulation issues in March of 2021. A speech language pathologist (SLP) noted speech articulation errors, but told parents the errors needed to show a delay of a year and have an adverse impact on her education. Noted examples of potential impact areas included trouble spelling or communicating with peers. No formal speech services or intervention were initiated at that time.

3

14. According to Student's Term 3 report card, she ended the year not on track to meet the district end of year goals for reading, including phonemic awareness standards[1] for kindergarten and first grade.

15. Parents sought external resources and interventions to bridge identified deficiencies, such as a tutoring program in the summer before first grade to assist her in reading and math.

### First Grade, 2021-2022

16. Shortly after entering first grade, Student was referred for reading intervention three to five times per week for approximately twenty minutes each. Her Fall Dyslexia screener indicated concerns in phonics, reading comprehension, Rapid Automatized Naming (RAN)[2], and orthography (spelling). Her Northwest Evaluation Association assessment (NWEA) overall reading score and her SORT R-3[3] also showed risk levels. Her overall score in the dyslexia screener placed her in the "some risk" range.

17. The Reading Interventionist reported that Student was at a kindergarten "Level A" book and was able to use picture clues to read and identify the beginning sounds in words. Parents informed Student's first grade teacher that Student had a family history of Dyslexia and ADHD[4] and conveyed other concerns regarding reading skills, ability, and comprehension.

---

[1] No phonemic awareness skills are listed in the Missouri Learning Standards after first grade, on the presumption these foundational reading skills are mastered.
[2] RAN is a task that measures how quickly individuals can name aloud objects, pictures, colors, or symbols. Ran is a skill predictive of efficacy in reading fluency, comprehension, and rate.
[3] Slosson Oral Reading Test, third edition an assessment of a student's reading level.
[4] Both conditions have a genetic component and are often clustered in families.

18.    At the end of Term 1, Student's teacher noted concerns with her ability to accurately identify short vowel sounds and her ability to visualize math problems, while noting that Student ended Term 1 not on track to meet her end of year reading goals.

19.    In addition to getting help at school, Student also began working with her grandmother, a seasoned educator and a Master's degree level reading specialist, twice per week, using a phonics program that integrated visual, auditory, and kinesthetic learning.  At the start of this outside intervention, Student still lacked letter sounds, many consonant sounds, and all vowel sounds at mid-year during first grade.

20.    In January of 2022, Mother informed first grade teacher that Student was struggling with anxiety, especially separation anxiety, at home.

21.    Updated assessments on Student occurred in January of 2022, which prompted WGSD to remove Student from reading intervention,[5] even though Student still flagged as "at risk" in phonological awareness areas, including identifying final sounds and deleting the initial phoneme in words as well as "at risk" in orthography.

22.    Student did not meet multiple first grade Missouri Learning Standards at the end of the year.

### Second Grade, 2022-2023

23.    Student began seeing a registered play and EMDR trained therapist in June of 2022, just prior to second grade. Student presented with anxiety.

---

[5] The underlying data utilized to compose this score sheet was not provided. The reading level was changed at some point to remove the 10 points and switch it to 0 under the Guided Reading Level section, but Petitioners could not verify the accuracy of any of this data.

24.    Student was placed into math intervention for her entire second grade year.

25.    Math intervention consisted of a small group approximately three days a week for twenty-five to thirty minutes per session.

26.    Parents did not learn of the math intervention until January of 2023 and were never provided any of Student's work product completed during math intervention as the math interventionist shredded all records, including tests and written work when math intervention services ended.

27.    Student also received reading assessments at the beginning of the year, identifying her "at risk" or in the "high risk" range. Student scored "at risk" on her NWEA reading score and on the dyslexia screener provided. Student scored in the "high risk" range for spelling in the District's Words Their Way assessment and her overall score on district assessments was in the "at risk" range.

28.    In January of 2023, Parents inquired into Student's progress in math interventions as they received no updates.

29.    The second-grade teacher informed Parents that Student needed small group or one on one help in math and noted that she struggled with confidence in problem solving as Student needed directions explained to her in more than one way, and guidance with math problem solving.

30.    The second-grade teacher indicated Student was reading "slightly below our grade level expectations."

31.    Mother notified the school counselor on January 19, 2023, to alert her that Student was having a lot of anxiety and lacked confidence in her reading and math abilities.

32.    In early 2023, Parents also notified WGSD they scheduled Student with a psychiatrist to initiate a full evaluation.

33.    Student began seeing a board-certified and fellowship trained child and adolescent psychiatrist in January of 2023 for anxiety connected with academic difficulties and school attendance.

34.    WGSD conducted assessments on Student in January 2023. The complete results were not provided to Parents, but she continued to show risk in her NWEA scores and the District's dyslexia screener as the NWEA flagged her as "at risk" in reading and orthography and the winter dyslexia screening again flagged Student as "high risk" in phonological awareness.

35.    At this time in January 2023, the District did not offer an evaluation or refer her for suspicion of a disability.

36.    In February of 2023, Mother inquired about the Celebrate Reading literacy intervention program sponsored by the WGSD in the summer, and the second-grade teacher referred Student for the intensive summer remediation program.

37.    On February 13, 2023, Parents notified the district that Student received a medical diagnosis of anxiety, and she started receiving medication and engaged in weekly counseling. This information did not prompt a referral for special education.

38.    The District Spring of 2023 dyslexia screener removed all references to phonological awareness and failed to test Student for this skill despite prior deficits.

39.    On May 17, 2023, Student was formally diagnosed with ADHD, and she began to receive a low dose of a stimulant medication of which multiple members of the WGSD staff were notified via email.

40.    Student's combination of ADHD and anxiety impacts her ability to sustain attention and decreases her mental stamina.

41.    Student's term 3 report card included concerns with reading, writing and spelling.

42.    Student failed to meet multiple Missouri Learning Standards in reading, writing and math at the close of the school year.

### Third Grade (2023-2024 School Year)

43.    Prior to the start of Student's third grade year, Parents informed the Principal of Student's anxiety diagnosis and prescribed medication. Shortly thereafter, Student received an ADHD diagnosis combined type – and prescribed medication. Mother indicated that her psychiatrist recommended some accommodations be made available at school and inquired about whether a 504 would be appropriate. The principal indicated he did not think Student needed a 504. No referral for a 504 or an IEP was made at that time.

44.    Student continued to qualify for math interventions at the beginning of her third-grade year and received intervention into February of 2024. When Student's composite score on the math NWEA was proficient, she no longer qualified for intervention, despite scoring "basic" in three of the four categories.

45.    Mother notified the school of Student's medications in August of 2023 and discussed that her stimulant prescription was wearing off abruptly necessitating a booster dose. With this, Student's behavior began to change, and she became more isolated, disruptive, and emotional.

46.    WGSD provided reading screens to Student at the beginning of the third-grade year, which noted significant concerns in her Oral Reading Accuracy, but

deemed her ineligible for reading support. Additionally, Student scored "at risk" in orthography. Parents were not provided the results of these tests.

47.  On her orthography assessment, a Words Their Way spelling test, Student was only able to spell six out of twenty-five words correctly, and her spelling ranked in the "Early Letter name-alphabetic phase". Parents only obtained this testing after they filed the Due Process Petition.

48.  At the end of Term 1, the third-grade teacher noted that areas for growth included retelling stories, consistently using punctuation, and the need to master multiplication facts.

49.  In October and November of 2023, the school began administering her a booster dose of medication as her school related behaviors worsened.

### Term 2 Concerns

50.  During November parent teacher conferences, Parents expressed concerns about Student's spelling, phonics, reading and specific concerns about dyslexia.

51.  At the start of Term 2, Student was placed back into reading intervention to specifically address phonics deficits.

52.  In December, the third-grade teacher expressed a concern that Student had some "gaps in her understanding of sounds" and provided some take home activities to help build "phonics background."

53.  Student took a winter 2023 math assessment and was projected to score "Basic" in the Spring Missouri Assessment Program (MAP), indicating some knowledge and skills are below grade level.

54.    A winter reading assessment again flagged concerns for Student when she scored in the highest risk range for reading accuracy and spelling. A benchmark reading assessment indicated Student struggled with "limited comprehension." None of these assessments were shared with Parents until after the Due Process was filed.

55.    On the January 2024 Words Their Way assessment, Student only spelled five of the same twenty-five words correctly.

56.    Student's Term 2 report identified concerns in writing and grammar, and Student was placed in reading interventions specifically for phonics support and spelling.

57.    Student was marked as "not on track for meeting end of year goals" in writing at the conclusion of term two.

**Term 3 Concerns**

58.    In February of 2024, Student switched from math intervention to spelling intervention, spending three days per week for approximately twenty-five minutes in this intervention. She remained in the intervention through the end of the school year.[6]

59.    At some point during her third-grade year, a Reading Success Plan (RSP) was developed for Student, but Parents did not recall seeing it until after the school year was completed. The plan documented Student's below grade level expectations in reading accuracy that persisted throughout the year.

60.    A spelling goal was set but not met. She remained in an "at risk" range in spelling, despite interventions.

---

[6] Due to scheduling issues, this support was removed for fourth grade.

10

61.    The reading specialist identified that at the end of third-grade, Student remained below grade level expectations, was "far from expectation," and that the data from the school indicated that throughout the years Student consistently struggled with spelling orthography.

## Parental Request for Evaluation

62.    On February 5, 2024, Parents indicated a desire to pursue a 504 for Student. Shortly after that request, parents received an invitation to sign up for a reading conference with a reading specialist. After learning the school had placed Student back into a phonics/spelling intervention, in addition to math interventions, Parents changed their request to ask for testing for a SLD in math and/or reading.

63.    Prior to Parents request for special education, Parents lacked progress reports or data on interventions or internal WGSD assessments. Parents were concerned about Student's reading, math, writing, spelling, language, ADHD, and anxiety, and the overall impact of these issues on her learning.

64.    Mother filled out the provided "Home Concerns Checklist" in which she noted that Student was very impulsive and expressed fears or worries about school "almost always" in the areas of math and reading. Mother stated her biggest concerns included the possibility of learning disabilities in math and dyslexia, noting that she had a lot of difficulty with phonics, and that her impulsivity from her ADHD was interfering with her learning.

65.    Student's maternal grandmother also filled out a Home Concerns Checklist in which she noted Student expressed fears and worries about school in reading, math, and spelling, and she listed her "biggest concern" for Student as the

11

following: "Processing receptive language- Doesn't always seem to get what is being said to her. Academics in general."

66. Father's Home Concerns Checklist indicated Student sometimes expressed fears and worries about school, particularly in reading and math, and he noted that his biggest concerns included academic abilities, struggles to focus, and concerns that she was progressing slowly and was behind her average peers. Father also filled out a Parent Contact Form where he noted slowed progress and regression in language skills including reading and writing and listed other unsuccessful interventions as well as medical conditions.

67. Student's third grade teacher also provided information in which she noted a significant concern in phonetic word attack, spelling, and "<u>significant concerns</u>" in the areas of writing. She indicated Student was "below grade level" in writing. Student lacked expected math fluency. Teacher rating scales for Student indicated moderate difficulties with sustained attention and working memory and fit the pattern seen in children diagnosed with ADHD-I.

### Review of Existing Data Form

68. By March 4, 2024, an Existing Data form was completed internally by Districts compiling the information from all parties. The Districts were on notice at that time of Student's February 2023 anxiety diagnosis, use of psychotropic medication, and her May 2023 ADHD diagnosis. No actual meeting was held to discuss concerns and determine appropriate areas for testing.

69. The RED form included Student's grandmother's concerns with receptive language and her inability to understand what is said to her, as well as the Father's

concerns with writing and reading. No follow up on these concerns was conducted, instead Districts checked the "No" box, thus declining an assessment of language.

70.   The Districts acknowledged that there were concerns with language but declined testing anyway.

71.   The Districts also understood that Parents were concerned with dyslexia and that dyslexia is a language-based learning disability. However, the District evaluator unilaterally decided she was not suspicious of dyslexia and did not intend to test for a language-based disability or co-morbid deficits in phonological awareness and phonemic awareness.

72.   In the area of written expression, Student's teacher indicated Student had "significant weaknesses" in the following areas: use of correct grammar, punctuation, capitalization, and spelling.

73.   At the conclusion of the form, Districts checked the box stating that the IEP team members and other qualified professionals "conferred" rather than "met" to discuss all relevant existing evaluation information to determine what, if any, additional data was needed. The form indicated that the "IEP team" made the determinations on March 8, 2024, Parents were not part of the decision making or "conferral" process except to return the forms provided to them by the school.

74.   Upon information and belief, Districts routinely decline to hold RED meetings and invite Parental participation in the process.

75.   DESE guidance indicates when a RED is conducted without a meeting, it is essential that all parties confer and hear all the information to make the determination. DESE specifically states that conferral is not simply issuing

questionnaires but discussing the data among all participants to make a determination on what additional data is necessary.

76.   Neither WGSD or SSD requested further information or input from Student's therapist or psychiatrist. No records from private providers were requested.

### Evaluation Information

77.   On March 8, 2024, SSD's School Psychologist informed parents that she had reviewed the documentation and provided them with her "evaluation plan," stating she would complete assessments in cognition, academic achievement, and social-emotional behavior to consider eligibility for Specific Learning Disabilities (SLD) and Other Health Impairment (OHI).

78.   Parents were informed that SSD planned to use the Kaufman Assessment Battery for Children to test Student's intellect along with the requisite observations in reading, writing, math, and specials.

79.   On April 9, 2024, prior to any review of evaluation data, Mother notified SSD that Student was now getting executive functioning tutoring along with math/reading tutoring once a week based on her pediatrician's referral. Her tutor, a former WGSD teacher, provided feedback on an executive functioning questionnaire. The tutor also noted concerns with Student's reading and writing.

### School Based Assessments

80.   On April 30, 2024, Student was given a reading screen and scored in the "limited understanding" range while her NWEA reading test resulted in a growth score in the bottom 25%.

81.   On May 8, 2024, Student was again provided the Words Their Way spelling test, in which she spelled only ten of twenty-five words correctly, Student was

also given her NWEA math assessment on May 8, 2024, in which she was projected to score in the "basic" range or below grade level on the Spring MAP test based on her scores.

82. Mother sent a request for the testing data to the District's School Psychologist prior to the meeting with the Districts, but Mother received no response nor was any data provided.

### Eligibility Meeting

83. On May 9, 2024, a meeting was set to go over the evaluation results. An agenda was prepared in advance of the meeting, and the Districts' position was predetermined.  The agenda declared "(Criterion not met for SLD)" under both the WIAT testing section and the KTEA, while also indicating that spelling was found to be an area of significant weakness but determined to not be a "stand-alone" area of eligibility according to state criteria.

84. Parents were not aware that testing in phonological awareness had not been performed nor had mandatory observations been conducted.

### Eligibility Report

85. After the conclusion of the meeting an SSD Evaluation report was created and sent to Parents. The report lacked many of the concerns reported by family and educators and failed to detail the interventions and other supports provided over the years.

86. Under Math, the report indicates Student was within grade level expectations according to the teacher report even though Student's third grade report card for Term 2 reflected her not meeting all twelve math expectations.

87.   Under the Reading section, there is no reference to her flagging as "high risk" in the NWEA Oral Reading Accuracy test in both Fall and Winter.

88.   For Writing, the evaluation report states Student was on track to meet third grade standards in writing, which contradicts Student's Term 2 report card, which lists her as not on track to meet all grade level expectations in writing. It also contradicts teachers noted concerns Student was below grade level expectations.

89.   Under Social-emotional behavior, no information from Parents or maternal grandmother was included, and no data or information was taken from her therapist or psychiatrist.

90.   Nothing in the report addressed noted concerns with anxiety.

### Mandatory Classroom Observations

91.   As part of every special education evaluation, classroom observations are required to be conducted of the student in each area of suspected disability. The District's School Psychologist only conducted a single observation on April 19, 2024, in math and writing and failed to conduct an observation in reading. Her observations did not follow state guidance or expectations.

### SSD Evaluation

92.   SSD's School Psychologist failed to perform a comprehensive evaluation, omitting multiple assessments in each battery. The omitted assessments were in areas of suspected learning disabilities.  SSD's School Psychologist deliberately omitted significant subtests designed to measure reading, writing, math, and language processing scores. The following subtests were not performed: Phonemic Proficiency (Elision of syllables/initial sounds, Elision of final/medial sounds, substitution, reversal), Listening Comprehension (receptive vocabulary, oral discourse

comprehension), and oral expression (Expressive vocabulary, oral word fluency, sentence repetition).

93.  Because SSD failed to perform those subtests, no composite scores could be calculated in the areas of primary concern: Basic Reading, Oral Language, Phonological Processing, or a Dyslexia Index score.

94.  Multiple other concerns were noted in SSD's testing including blank score sheets for completed subtests, failure to record observations on score sheets and conclusions that were not consistent with the testing data. None of the testing booklets or data was shared with the eligibility team.

95.  SSD also gave Student select assessments on the Kaufman Test of Educational Achievement- Third Edition (KTEA-3) but chose to skip all the following assessments: phonological processing (blending, rhyming, sound matching, deleting sounds, segmenting sounds); reading vocabulary; associational fluency; listening comprehension; oral expression; object naming facility; writing fluency; Letter Naming Facility; and math fluency.

96.  Upon information and belief, Defendant SSD instructs evaluators to omit certain subtests that have a high correlation to findings of Specific Learning Disabilities including phonemic awareness and phonological awareness subtests.

97.  As a result of these omissions, no composite scores were compiled for any of the following areas: Sound-Symbol; Reading Understanding; Oral Language; Oral Fluency; Comprehension; Expression; Orthographic Processing; and Academic Fluency.

98.  When considering the 95% confidence intervals between Student's FCI and achievement testing on the KTEA-3, she demonstrated more than a 22-point

discrepancy in the following composite scores: Math Composite; Written Language Composite; Reading Fluency Composite; and Dyslexia Index.

99.   SSD's evaluation failed to test in identified areas of suspected disability and was neither complete nor comprehensive.

100. SSD failed to accurately report concerns in the BRIEF2 including that Students third grade teacher's rating scales indicated a pattern consistent with "children diagnosed with ADHD-I."

101.   SSD also handwrote various observations in the testing booklets that were not shared with the team including Student being off task, going off on tangents, and losing stamina during the testing.

102. Term 3 notes expressed concerns with capitalization, punctuation, and math facts. Despite failing to meet the only subcategory on her report card under Writing, she was marked as on track for meeting the end of year writing goal. Student's teacher admitted to marking a child as meeting year end goals even when they failed to meet grade level standards. Her teacher admitted Student was not meeting Missouri Learning standards in spelling, capitalization, punctuation, writing mechanics and multiplication.

103.  MAP testing also flagged concerns in Math.

104. Student did not meet multiple Missouri learning standards in reading, writing and math at the conclusion of the year.

**Private Evaluation**

105.   In July of 2024, Parents sought out private testing on the advice of their pediatrician. Parents felt that the SSD evaluation was incomplete and not comprehensive.

106. SSD did not explain to Parents what an Independent Educational Evaluation was or that they had the right to request SSD pay for testing if they disagreed with SSD's evaluation. As a result, Parents paid $2,400 for the private testing.

107.  Private testing was conducted over two days in July 2024 by a certified and qualified school psychological examiner.

108. Parents provided the private evaluator with the same medical information, observations, and academic information shared with Defendants.

109.  The private evaluation showed multiple areas of discrepancy greater than the required 22-point margin required under Missouri law. Significant concerns were noted in basic reading, reading fluency, spelling, and math.

110.  The evaluator also conducted the Comprehensive Test of Phonological Processing-Second Edition (CTOPP-2) with Student as the Districts' evaluations neglected to evaluate phonological processing. Significant concerns evidencing dyslexia were noted in the testing.

111.  A Gray Oral Reading test was also performed and resulted in a determination that Student was reading below grade level expectations. The evaluator noted Student engaged in a lot of repetition, self-correction, substitution, and leaving off sounds on most passages. She described her reading as "very effortful, very choppy," "well-below someone of her grade level," and very discrepant from non-learning-disabled children.

112.  At the conclusion of the testing, the evaluator concluded Student had learning disabilities in reading accuracy and fluency, and a learning disability in Math fluency. Recommendations were made for both school and home.

19

**New Request for Review of Existing Data Meeting**

113. On July 20, 2024, Parents emailed Districts staff to alert them of the private testing, diagnoses, and additional tutoring they were providing. Parents asked to "reconvene as soon as possible to review the new data."

114. The testing was also shared with Student's maternal grandmother, tutor, therapist and psychiatrist all of whom believed Student needed special education and related services.

115. On August 6, 2024 Parents emailed District staff with the full private evaluation. On August 7, 2024, the Principal at Clark Elementary forwarded the Parents email internally to multiple other members of WGSD and SSD, stating Student was tested in the Spring and "did not (and still does not) qualify for district interventions in math or reading" and declared she is "on grade level in all areas" and suggested telling the Parents they would not be testing her again.

116. In response, Defendant SSD indicated that because the evaluation constituted new information, the team would need to review the information and determine if there was enough new information to move forward with a formal evaluation.

117. On August 9, 2024, Parents were informed that a joint review decision would be made on whether to accept their request for an evaluation and Student's packet would be updated from the prior Spring.

118. Parents were not invited to participate in that review meeting.

**Fourth Grade (2024-2025 School Year)**

119.  Parents scheduled a conference with fourth-grade teacher for August 13, 2024, and requested someone from SSD attend the conference. No one from SSD attended.

120. At the conference, Parents expressed concerns with anxiety, ADHD, reading, writing, and math.

121.  On August 16, 2024, Parents received a request from Webster Groves School District's social worker to update their information.

122.  Mother returned an updated Parent Contact Form.

123.  Mother completed a second Home Concerns Checklist, identifying further information regarding Student's health conditions, dyslexia concerns, and score discrepancies.

124.  On the same date, Father returned a Parent Contact Form that lacked an area to express additional concerns and he also completed a second home concerns checklist in which Father identified Student's significant deficiencies in math, reading, and writing that were ongoing concerns from first grade and noted her dyslexia diagnosis.

125. Updated assessments were conducted which indicated significant concerns in spelling persisted. Her teacher noted concerns with reading including unnecessary self-corrections and repeating words which impacted fluency. Student received two in-class interventions for reading and still did not meet Missouri Learning Standards in multiple areas.

126. The school was notified of additional adjustments to medication. On August 29, 2024, Parents sent an email notifying the Districts of significant struggles related to Student's ability to complete homework.

127. Student self-reported on a WGSD survey a decline in school related mental health metrics.

## The Joint Review Committee

128. Upon information and belief, the members of the Joint Review Committee did not meet as documented.

129. Districts acknowledged the private testing constituted new evidence of a suspicion of disability. The testing met discrepancy requirements for the state of Missouri in word attack, reading fluency, oral reading, math fact fluency, math calculation, broad written language, and spelling. Additionally, Student's phoneme grapheme knowledge score was significantly discrepant.

130. Student's end of year report card indicated she failed to meet end of year expectations in some areas. Updated District assessments also flagged academic concerns.

## Denial of Services Without a RED

131. On September 4, 2024, Parents received a short email announcing that the Joint Review Committee reviewed the information and determined that a special education evaluation was not warranted. A Prior Written Notice was attached.

132. Because no meeting was held and no other information was requested prior to the denial, Parents did not have an opportunity to provide additional information related to Student's therapy or psychiatric needs.

133. Upon information and belief, Districts routinely fail to conduct formal reviews of outside evaluations and/or fail to allow parental participation in the review process.

22

134.  Parents asked for an explanation of the Committee's decision, including the criteria for the decision and the reasons for the denial, but only received a response regurgitating prior reasons for denying eligibility and information on how to request related records.

135.  Parents requested Student's educational records but only received incomplete records.

## Due Process Complaint

136.  On September 19, 2024, Parents filed a Due Process complaint with the Administrative Hearing Commission (AHC), seeking an IEP, reimbursement for private tutoring, and tuition to Churchill School, a private dyslexia school.

137.  At the time of the filing, Parents were not in possession of any raw data collected or used to make the denial determination or internal District emails.

138.  Parents were never provided the opportunity to meet with a team of WGSD and SSD professionals to review existing data for eligibility purposes.

139.  The Districts declined all opportunities to discuss the private evaluation, Student's diagnoses of ADHD and anxiety, behavior concerns, or correspondence from a psychiatrist about Student's medical condition and difficulties with school.

140.  In light of the Districts' continued refusal to provide specialized instruction or services, Student is transferring to Churchill School, a private school for children with learning disabilities. Plaintiffs seek reimbursement for future tuition.

## Due Process Hearing and Decision

141.  From October 30, 2024, to November 1, 2024, the AHC  held a hearing on the petition. The Commission framed the issues to be decided as follows:

a.    Whether Districts should have evaluated Student between the

summer of 2023 and the spring of 2024 when the Districts evaluated the Student;

       b.    Whether Student is a child with a disability recognized by the IDEA;

       c.    If Student has a recognized disability, whether Student requires special education and related services to receive a free and appropriate public education (FAPE);

       d.    If the Districts denied Student a FAPE, whether Student is entitled to compensatory education and for what time period.

142.    The hearing was held via WebEx. The AHC placed significant time limitations on the presentation of evidence at the hearing over Plaintiff's objections impacting their right to due process of law.

143.    On December 11, 2024, the AHC held the Plaintiffs failed to meet their burden to show the Districts violated the IDEA.

144.    The AHC held the Districts did not violate Child Find nor IDEA and denied all requests for reimbursement and future tuition.

145.    Plaintiffs dispute the AHC findings. The decision of the Commissioner was not supported by the evidence and is inconsistent with the IDEA and Missouri law in the following respects:

       a.    The decision is deficient in that it mischaracterizes evidence, misstates facts in evidence, fails to consider evidence, and fails to address obvious evidentiary weaknesses.

       b.    The decision erred in refusing to consider for eligibility purposes information and exhibits presented at the hearing that Parents were precluded from presenting to the Districts prior to the denial of eligibility due to the Districts procedural violations in refusing to hold a RED meeting and limiting Parents' ability to provide

24

information to preprinted, generic forms and checklists.

c.      The decision erred in refusing to consider issues of predetermination of eligibility that only became apparent after Districts internal emails and records were provided in the five day disclosures.

d.      The decision erred in discrediting portions of the testimony of Student's psychiatrist, therapist, and outside evaluator.

e.      The decision erred in determining the Districts did not violate Child Find by failing to evaluate at any point prior to February 2024 despite knowledge of ADHD and anxiety diagnoses and repeated and prolonged placement in intervention in reading and/or math.

f.      The decision erred in determining Student was achieving adequately for her age and meeting State-approved grade-level standards.

g.      The decision erred in determining Student did not demonstrate a pattern of strengths and weaknesses sufficient for an SLD educational diagnosis.

h.      The decision erred in determining Student's ADHD and anxiety did not adversely affect her educational performance.

i.      The decision erred in refusing to consider the ameliorative effects of medication for Student's ADHD and anxiety in determining eligibility for OHI.

j.      The decision erred in refusing reimbursement for the outside evaluation Parents obtained.

k.      The decision erred in giving little to no weight to the outside evaluation and conclusions.

l.      The decision erred in discounting the use of the GAI in the outside evaluation for purposes of determining discrepancy for an SLD.

m.    The decision erred in determining that discrepant scores in spelling and noted adverse academic impact did not qualify Student for an SLD eligibility.

n.    The decision erred in determining a severe discrepancy did not exist for purposes of utilizing professional judgement for SLD eligibility.

o.    The decision erred in determining Student did not meet eligibility for SLD in any area.

p.    The decision erred in determining Student did not meet eligibility for OHI.

q.    The decision erred in determining the Districts' evaluation was comprehensive.

r.    The decision erred in determining there was no basis to suspect a disability in receptive or expressive language requiring testing.

s.    The decision erred in determining Districts exercised appropriate discretion in declining to perform testing for dyslexia including skipping all subtests related to phonemic awareness and phonological awareness.

t.    The decision erred in determining Districts failure to conduct mandatory classroom observations in reading did not constitute a violation.

u.    The decision erred when it held the Districts gave full consideration to the private evaluation.

v.    The decision erred by refusing to consider procedural violations for the Districts' refusal to provide Student's educational records prior to the Due Process hearing.

w.    The decision erred in determining no RED meeting was required in the Fall of 2024 to discuss the outside evaluation and new data and information showing

Student was not meeting age and grade level expectations.

x.    The decision erred in not finding violations of parental participation in the IDEA process.

y.    The Commission erred in determining that Districts' failure to provide records requested by Parents did not violate their obligations under the IDEA.

z.    The Commission erred in determining the Districts' actions in denying eligibility did not constitute predetermination.

aa.    The Commission erred in allowing the Districts to present expert testimony without appropriately disclosing the expert over Plaintiff's objection.

bb.    The Commission erred in limiting the presentation of Parents' witnesses and evidence by overly restrictive time limitations.

cc.    The decision relied upon facts not in evidence.

dd.    The decision is deficient in denying reimbursement to Parents, despite evidence that the Districts denied Student a FAPE, the services offered by SSD/WGSD were not appropriate to compensate her for lost educational opportunities, and the private services Parents used were appropriate, entitling them to costs and expenses for the program and future similar costs.

<u>**COUNT I**</u>
**Failure to Provide Free and Appropriate Education**
*Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1401 et seq.*
*De Novo Review of Administrative Decision*
(By M.C. as Against All Defendants)

146.    Plaintiffs incorporate and reallege all the foregoing paragraphs in this count.

147.    Student is a child with a disability as defined by the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1401(3)(A).

148.    SSD and WGSD are Local Educational Agencies (LEA) as defined by the IDEA, 20 U.S.C. § 1401(9). Although SSD is tasked with special education services, both districts provide educational services to Student.

149.    Defendants failed to provide Student with a free appropriate public education (FAPE), in violation of IDEA and Missouri law, and the order and decision of the AHC should be reversed for failure to find that the Districts violated their Child Find obligation, for failure to find that the Districts committed numerous procedural and substantive violations of the IDEA, and for failure to order costs and expenses to Parents.

<u>**COUNT II**</u>
**Disability Discrimination**
*Section 504, Rehabilitation Act, 29 U.S.C. § 794 et seq.*
(By M.C. as Against All Defendants)

150.    Plaintiffs incorporate and reallege all the foregoing paragraphs in this count.

151.    The Districts violated Plaintiff's rights under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794.

152.    The Districts also violated different and independent procedural and substantive requirements of Section 504.

153.    The IDEA does not provide the exclusive remedy for violations of the educational rights of students with disabilities.

154.    Student is an individual with a disability and a student with a disability as defined by the Rehabilitation Act, 29 U.S.C. § 705.

155.    SSD and WGSD are local Educational Agencies (LEA) as defined by the IDEA, 20 U.S.C. § 1401(9), that receive federal financial assistance, and therefore constitute a program or activity covered by the Rehabilitation Act, 29 U.S.C. § 794.

Although SSD is tasked with special education services, both districts provide educational services to Student.

156.     Defendants, solely based on Student's disability, excluded her from participation in, denied her the benefits of, and subjected her to discrimination under a program or activity receiving federal financial assistance in violation of 29 U.S.C. § 794(a).

157.     Defendants acted in bad faith or with gross misjudgment in that their conduct deviated so substantially from accepted professional judgment, practice, or standards as to demonstrate that they acted with wrongful intent.

158.     The Districts' actions discriminated against Student on the basis of her disability in violation of Section 504 when it:

     a.     Denied her the opportunity to participate in or benefit from aids, benefits or services it offers others;

     b.     Denied her the opportunity to participate in or benefit from aids, benefits or services that are equal to that afforded to others;

     c.     Provided her aids, benefits or services that are not as effective as those provided to others;

     d.     Unnecessarily provided her with different or separate aids, benefits or services;

     e.     Otherwise limited her in the enjoyment of all the rights, privileges, and advantages and opportunities enjoyed by others receiving their aids, benefits and services;

     f.     Deprived Student of an equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement in the most integrated setting appropriate to her needs;

g.      Utilized criteria or methods of administration that have the effect of subjecting her to discrimination, or have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the programs or activities; and

h.      Determining the site or location of services in a manner that has the effect of excluding her, denying her the benefits of or subjecting her to discrimination under its programs or activities.

i.      Intentionally withholding relevant educational information from Parents;

j.      Intentionally omitting testing in areas of suspected disability;

k.      Retaliating against Plaintiffs as they sought to enforce Student's rights by withholding important educational information, persistently refusing requests for documents, and refusing to utilize data, evaluations and other information to appropriately determine Student's educational needs and services.

159.    As a result of disability discrimination Student has been relegated to an inferior education program with fewer services, programs, activities, benefits and other opportunities, and an inferior status in the enjoyment of critical education services, resulting in educational, functional, communication, and social disadvantages in ways that diminish her current and future communication, health, independence, safety, self-esteem, relationships, dignity, productivity, satisfaction and well-being, in a direct affront to the purposes of federal special education and anti-discrimination laws.

160.    As a result of disability discrimination, Student has been significantly impeded in making progress towards the goals of equal opportunity, full participation, independent living, and economic self-sufficiency, contrary to the purposes of federal special education and anti-discrimination laws.

161.     As a direct result of disability discrimination Plaintiff has expended private funds to provide evaluations of Student's disabilities and needs, as well special education and related services in an amount to be established at trial that the Districts should be ordered to pay.

162.     As a result of Defendants' conduct, Plaintiff suffered injuries and actual damages in an amount to be established at trial that the Districts should be ordered to pay.

163.     Plaintiff is entitled to compensatory and emotional distress damages, equitable relief, costs, and attorney's fees.

**COUNT III**
**Disability Discrimination**
*Americans with Disabilities Act (ADA), 42 U.S.C. 12131 et seq.*
(By M.C. as Against All Defendants)

164.     Plaintiffs incorporate and reallege all the foregoing paragraphs in this count.

165.     The Districts violated Plaintiff's rights under Title II of the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. §§ 12101, *et seq.*

166.     The Districts also violated different and independent procedural and substantive requirements of the ADA.

167.     The IDEA does not provide the exclusive remedy for violations of the educational rights of students with disabilities.

168.     Student is a qualified individual with a disability under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12131(2); *see also* 42 U.S.C. § 12102(1), (2); 28 C.F.R. § 35.108(b), (c).

169.     SSD and WGSD are public entities within the meaning of the ADA. 42

U.S.C. § 12131(1)(B). Although SSD is tasked with special education services, both districts provide educational services to Student.

170.    Defendants excluded Student from participation in and denied her the benefits of the services, programs, or activities of a public entity and subjected her to discrimination, in violation of 42 U.S.C. § 12132.

171.    Defendants acted in bad faith or with gross misjudgment in that their conduct deviated so substantially from accepted professional judgment, practice, or standards as to demonstrate that they acted with wrongful intent.

172.    The Districts' actions discriminated against Student in violation of 42 U.S.C. §12312 and 28 C.R.R. §35.130 when it:

   a.    Denied Student the opportunity to participate in or benefit from the aid, benefit or service;

   b.    Afforded Student an opportunity to participate in or benefit from the aid, benefit or service that was not equal to that afforded others;

   c.    Provided Student an aid, benefit, or service that was not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others;

   d.    Provided Student different or separate aids, benefits or services than provided to others and refused to provide modifications necessary to its standard schedule in order to provide her with aids, benefits or services as effective as those provided to others;

   e.    Otherwise limited Student in the enjoyment of a right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit or service;

   f.    Denied Student the opportunity to participate in services,

programs, or activities that are not separate or different;

g. Utilized criteria or methods of administration that had the effect of subjecting Student to discrimination on the basis of disability, and had the purpose or effect of defeating or substantially impairing accomplishment of the objectives of its program with respect to individuals with disabilities;

h. Refused to make reasonable modifications to policies, practices or procedures when necessary to avoid discrimination on the basis of disability;

i. Imposed or applied eligibility criteria that screen out or tend to screen out an individual or class or individuals with disabilities from fully and equally enjoying any service, program or activity;

j. Retaliating against Plaintiffs as they sought to enforce Student's rights by withholding important educational information, persistently refusing requests for documents, and refusing to utilize data, evaluations and other information to appropriately determine Student's educational needs and services; and

k. Failing to have adequate policies, procedures, protocols, training and oversight so as to ensure Student was not subject to discrimination.

173. As a result of disability discrimination, Student has been relegated to an inferior education program with less services, programs, activities, benefits and other opportunities, and an inferior status in the enjoyment of critical education services, resulting in educational, functional, communication, and social disadvantages in ways that diminish her current and future communication, health, independence, safety, self-esteem, relationships, dignity, productivity, satisfaction and well-being, in a direct affront to the purposes of federal special education and anti-discrimination laws.

174. As a result of disability discrimination, Student has been significantly

impeded in making progress towards the goals of equal opportunity, full participation, independent living, and economic self-sufficiency, contrary to the purposes of federal special education and anti-discrimination laws.

175.     As a direct result of disability discrimination, Plaintiff has expended private funds to provide evaluations of Student's disabilities and needs, as well special education and related services in an amount to be established at trial that the Districts should be ordered to pay.

176.     As a direct result of disability discrimination, Student has suffered injuries and damages in an amount to be established at trial that the Districts should be ordered to pay.

177.     As a result of Defendants' conduct, Plaintiff are entitled to compensatory and emotional distress damages, injunctive relief, costs, and attorney's fees.

**COUNT IV**
**Disability Discrimination**
*Section 504, Rehabilitation Act, 29 U.S.C. § 794 et seq.*
(By Thomas and Rebecca Chibnall as Against All Defendants)

178.     Plaintiffs incorporate and reallege all the foregoing paragraphs in this count.

179.     The Districts violated Plaintiffs' rights under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794.

180.     The Districts also violated different and independent procedural and substantive requirements of Section 504.

181.     The IDEA does not provide the exclusive remedy for violations of the educational rights of students with disabilities.

182.    Student is an individual with a disability and a student with a disability as defined by the Rehabilitation Act, 29 U.S.C. § 705. The remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964 are "available to any person aggrieved by any act or failure to act by any recipient of Federal assistance" under 29 U.S.C. § 794. 29 U.S.C. § 794a(a)(2). Parents are such aggrieved persons.

183.    SSD and WGSD are local Educational Agencies (LEA) as defined by the IDEA, 20 U.S.C. § 1401(9), that receive federal financial assistance, and therefore constitute a program or activity covered by the Rehabilitation Act, 29 U.S.C. § 794. Although SSD is tasked with special education services, both districts provide educational services to Student.

184.    Defendants, solely on the basis of Student's disability, excluded her from participation in, denied her the benefits of, and subjected her to discrimination under a program or activity receiving federal financial assistance, in violation of 29 U.S.C. § 794(a). Further, Parents were themselves denied meaningful participation as parents in Student's education, procedural safeguards and due process, all on the basis of Student's disabilities.

185.    Defendants acted in bad faith or with gross misjudgment in that their conduct deviated so substantially from accepted professional judgment, practice, or standards as to demonstrate that they acted with wrongful intent.

186.    As a result of Defendants' discriminatory actions, Parents have incurred injuries and damages including, but not limited to, significant expenses incurred in obtaining private services to address Student's educational needs as well as attorney's fees.

187.    Plaintiffs are entitled to compensatory and emotional distress damages,

equitable relief, costs, and attorney's fees.

**COUNT V**
**Disability Discrimination**
*Americans with Disabilities Act (ADA), 42 U.S.C. 12131 et seq.*
(By Thomas and Rebecca Chibnall as Against All Defendants)

188.    Plaintiffs incorporate and reallege all the foregoing paragraphs in this count.

189.    The Districts violated Plaintiffs' rights under Title II of the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. §§ 12101, *et seq*.

190.    The Districts also violated different and independent procedural and substantive requirements of the ADA.

191.    The IDEA does not provide the exclusive remedy for violations of the educational rights of students with disabilities.

192.    Student is a qualified individual with a disability under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12131(2); *see also* 42 U.S.C. § 12102(1), (2); 28 C.F.R. § 35.108(b), (c).

193.    Parents are qualified individuals under the Americans with Disabilities Act, 42 U.S.C. § 12112(b)(4), due to their association and relationship with Student.

194.    SSD and WGSD are public entities within the meaning of the ADA. 42 U.S.C. § 12131(1)(B). Although SSD is tasked with special education services, both districts provide educational services to Student.

195.    Defendants excluded Student from participation in and denied her the benefits of the services, programs, or activities of a public entity and subjected her to discrimination, in violation of 42 U.S.C. § 12132.

196.    Defendants acted in bad faith or with gross misjudgment in that their

36

conduct deviated so substantially from accepted professional judgment, practice, or standards as to demonstrate that they acted with wrongful intent.

197.    Defendants discriminated against Parents Thomas and Rebecca Chibnall, in that Parents have a relationship or association with Student *See* 42 U.S.C. § 12112(b)(4) (discrimination includes excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association); 28 C.F.R. § 35.150(g) (public entity shall not exclude or otherwise deny equal services, programs, or activities to an individual or entity because of the known disability of an individual with whom the individual or entity is known to have a relationship or association.).

198.    As a result of Defendants' discriminatory actions, Parents have suffered injuries and damages including, but not limited to, significant expenses incurred in obtaining private services to address Student's educational needs and attorney's fees.

199.    Plaintiffs are entitled to compensatory and emotional distress damages, equitable relief, costs, and attorney's fees.

## PRAYER FOR RELIEF

Plaintiffs respectfully request the following relief:

1.    The Court find that the Districts violated the Child Find provisions of IDEA;

2.    The Court find that the Districts committed numerous procedural and substantive violations of the IDEA;

3.    The Court find that the Districts failed to provide a Free and Appropriate Public Education under the IDEA;

4.    The Court order reimbursement to Parents for the costs and expenses of private tutoring and tuition;

5.    General, specific, economic, emotional distress, pain and suffering, and compensatory damages;

6.    Costs, expenses, and reasonable attorneys' fees;

7.    Pre- and post-judgement interest;

8.    Declaratory and injunctive relief; and

9.    Such other relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

Dated: January 24, 2025                    Respectfully submitted,

By: /s/Diane L. Dragan
DRAGAN LAW FIRM, LLC
Diane L. Dragan (MO 73591)
131 Prospect Ave. Suite A
Kirkwood, MO 63122
Diane@Draganlawfirm.com
314-788-7323

Attorney for Plaintiffs

38